FILED

08/14/2019

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 21, 2019 Session

IN RE C.M. ET AL.

Appeal from the Juvenile Court for Sevier County
No. 18-000896, 18-000897    Dwight E. Stokes, Judge

_____

No. E2018-02108-COA-R3-PT
_____

M.O. (mother) and K.M. (father) appeal from the trial court's order terminating their parental rights with respect to C.M. and M.M. (the children). The court determined that clear and convincing evidence supported multiple grounds for terminating mother and father's parental rights. By the same quantum of proof, the court determined that termination is in the best interest of the children. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, K.M.

Elizabeth A. Brady, Sevierville, Tennessee, for the appellant, M.O.

Herbert H. Slatery, III, Attorney General and Reporter, and Erin A. Shackelford, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

C.M. and M.M. were born to mother and father out-of-wedlock. C.M. is six years old. He has serious medical conditions, including cerebral palsy and Chiari malformation. Before starting elementary school, C.M. attended Trula Lawson, a specialized preschool where he received occupational, physical, and speech therapy. He

still attends physical therapy and speech therapy twice per week. M.M. is three years old. She attends daycare and does not have special needs.

DCS concedes that mother and father were initially willing and able to parent the children. Father had a steady job. Both parents demonstrated a knowledge and ability to care for C.M.'s special needs. Mother and father also had a loving relationship with the children.

In 2016, father was diagnosed with stage four testicular cancer. He began chemotherapy and was prescribed pain medications. Father admits that he became addicted to opiates during the course of his treatment. His prescription expired after approximately one year but he continued to use drugs. Mother testified that she began using drugs in order to cope with the stress of having a husband with cancer and a child with special needs. During this time, the parents struggled to pay their bills.

In February 2017, DCS became involved due to allegations of substance abuse and lack of supervision. The case was closed after parents complied with a non-custodial permanency plan.

On June 12, 2017, mother was arrested at an Exxon EZ gas station. Witnesses called police after observing that mother appeared to be "on something." Witnesses also said that mother was screaming at the children and smacked the hand of one of the children for picking up a cup. Responding officers found C.M. covered in "throw-up." His diaper was full of urine and fecal matter. Mother claimed she was taking C.M. to the hospital. She denied being in possession of anything illegal. However, police discovered a white powder residue on a red straw in mother's purse. Mother admitted that she used the straw the previous day to snort a "Roxy pill" (Roxicodone). Police charged mother with driving on a revoked license, child neglect and abuse, and possession of drug paraphernalia.[1] Mother tested positive for amphetamines, methamphetamines, opiates, and THC. She also admitted to using "meth" twice in the past week.

DCS attempted to return the children to father. When DCS asked father to submit to a drug screen, father said he would fail because of medication given to him after a recent emergency room visit. DCS insisted that a drug screen was still necessary. Father then admitted that he would test positive for other drugs. Ultimately, father tested positive for amphetamine (Adderall), benzodiazepine (Xanax), buprenorphine (suboxone), methamphetamine, opiates (Dilaudid and morphine), benzodiazepine (hydrocodone), and THC. On June 14, 2017, the children were taken into DCS custody. Nearly three weeks later, mother was charged with shoplifting from Wal-Mart.

---

[1] The child neglect and abuse charges were later dropped.

On August 9, 2017, the children were adjudicated dependent and neglected. A permanency plan was ratified on the same day. This plan was revised twice. Each permanency plan required mother and father to: comply with recommendations regarding legal issues; maintain stable housing, income, and transportation; notify DCS of any changes in circumstances; submit to and pass random drug screens; complete A&D assessments and follow recommendations, and sign releases for DCS. The third permanency plan added adoption as a permanency goal.

The children were placed in foster care. According to DCS, the foster mother has formed a close bond with the children. Although the foster mother has no official training in helping children with special needs, she works in special education at Trula Lawson (the same specialized preschool that C.M. attended). So far, the foster mother has successfully cared for the children. They have attended all necessary medical appointments. In an effort to reach out to the family, the foster mother has also formed a bond with paternal great-grandparents. The foster mother intends to adopt the children.

DCS concedes that mother and father complied with the requirements of the permanency plan for the first few months. For example, the parents completed A&D assessments, passed drug screens, completed rehabilitation programs, and regularly visited the children. However, the parents began to backslide. In October 2017, DCS discovered that parents had lost their previous housing. The parents were also more evasive. They failed to consistently communicate with DCS. They also failed to attend drug screens on December 21, 2017, January 10, 2018, and January 23, 2018.

On October 27, 2017, mother was charged with theft. She admitted to stealing about $487 from Cheddar's (her employer at the time). On January 24, 2018, mother tested positive for opiate, oxycodone, and THC. On February 19, 2018, an arrest warrant was issued for mother. Mother was served with the warrant and arrested the next day. On March 12, 2018, mother pled guilty to violating the terms of her probation. She served forty-four days of a sixty-day sentence.

In April 2018, mother missed another A&D assessment. On April 12, 2018, she visited the children for the last time. On the same day, mother passed a drug screen. Soon after, mother entered an in-patient treatment program at Comprehensive Community Services (CCS). She completed the program in June 2018.

On June 27, 2018, DCS requested that mother submit to a drug screen "wherever was appropriate and convenient for her." Mother told DCS she would call back to schedule the drug screen. She never did. On July 3, 2018, DCS contacted mother again. Mother said that she was in Illinois taking care of her ill sister and would return to Tennessee on July 9, 2018. However, mother refused to provide the address of her Tennessee residence. Instead, she encouraged DCS to send mail to her grandmother's home in Dandridge.

Father admits that he relapsed in January 2018. He began using drugs and stole his grandparents' credit card. In February or March 2018, father enrolled at an in-patient treatment program called Serenity Network. He attended the program for three weeks but discontinued treatment. Father claimed he was not satisfied with the curriculum. He then began in-patient treatment at CCS. He completed the program on June 1, 2018.

On July 2, 2018, DCS filed a petition to terminate mother and father's parental rights. A few days later, as a result of an unrelated investigation, DCS discovered that mother and father were living in a home with rampant drug abuse. A DCS worker testified that everyone in the home was abusing drugs and there was very limited food. The DCS worker testified that the living conditions were very poor and that there were all kinds of pills and needles in mother and father's room. Both parents denied having children. They also refused drug screens. According to DCS, father admitted to using marijuana and opiates. Mother initially admitted to using marijuana. After investigators found additional evidence of drug use, mother admitted to using Dilaudid and opiates. Father was arrested on charges related to the January 2018 theft of his grandparents' credit card. He served ninety days in jail and was released on October 5, 2018. His sentence carried six years of probation. Mother continued to cancel or reschedule drug screens. She was incarcerated again on August 15, 2018.

A termination hearing was held on October 25, 2018. At the time of the hearing, mother was still incarcerated but was present at the hearing. Mother was scheduled to be released nearly one month after the hearing. Father participated telephonically. Father testified that he was living with the paternal grandfather in Pennsylvania. Father also testified that his living situation was suitable for mother and children. He claimed that he had a job making seventeen dollars per hour; that he had a valid driver's license; and that he was currently attending an intensive outpatient program.

A DCS worker testified that mother still needed to: provide proof that she completed her second rehabilitation treatment; complete another A&D assessment; comply with additional drug screens; resume visitation; and resolve legal issues. Father needed to: complete a home study, follow after-care recommendations, finish attending intensive outpatient treatment, demonstrate an ability to maintain sobriety, and resume regular visitation.

The trial court entered an order terminating mother and father's parental rights on multiple grounds. Both parents timely appealed.

## II.

The parties raise the following issues on appeal:

- 4 -

Whether the trial court erred in finding clear and convincing evidence to terminate mother and father's parental rights on the ground of substantial noncompliance with the permanency plan.

Whether the trial court erred in finding clear and convincing evidence to terminate mother and father's parental rights on the ground of failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the children.

Whether the trial court erred in finding clear and convincing evidence to terminate mother's parental rights on the ground of abandonment by incarcerated parent.

Whether the trial court erred in finding clear and convincing evidence to terminate mother's parental rights on the ground of abandonment by failure to provide a suitable home.

Whether the trial court erred in finding clear and convincing evidence that termination of the mother and father's parental rights is in the best interest of the children.

## III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). Although this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (Supp. 2018) (amended 2019). Termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), and a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual

findings." ***In re Bernard T.***, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable*." In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. ***In re Angela E.***, 303 S.W.3d at 251 (citing ***In re Marr***, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." ***Id.*** at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." ***In re C.B.W.***, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. ***In re Carrington***, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

The trial court found clear and convincing evidence to terminate mother *and* father's parental rights on two grounds: (A) substantial noncompliance with the permanency plan; and (B) failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the children. The court found two *additional* grounds for terminating mother's rights: (C) abandonment by failure to provide a suitable home; and (D) abandonment by an incarcerated parent.

## A.

"Substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan" is a ground for terminating parental rights. Tenn. Code Ann. § 36-1-113(g)(2). To carry its burden of proving this ground, DCS must show that the permanency plan includes a "statement of responsibilities" that "clearly communicate[s] to the parent: 'this is what you must do to regain custody of your child.' " *In re Navada N.*, 498 S.W.3d 579, 603 (Tenn. Ct. App. 2016) (citing *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526, at *13 (Tenn. Ct. App., filed Sept. 14, 2012)). DCS must also show that the permanency plan's requirements are "reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re T.R.*, No. E2017-02115-COA-R3-PT, 2018 WL 4441359, at *10 (Tenn. Ct. App., filed Sept. 17, 2018) (citing *In re Navada N.*, 498 S.W.3d 579, 603 (Tenn. Ct. App. 2016); *In re M.J.B.*, 140 S.W.3d 643, 656-57 (Tenn. Ct. App. 2004)).

Further, DCS must demonstrate that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d 539, 548-49 (Tenn. 2002); *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App., filed June 3, 2003)). "Trivial, minor, or technical deviations from a permanency plan's requirements" do not support a finding of "substantial noncompliance." *In re Valentine*, 79 S.W.3d at 548 (Tenn. 2002); *Dept. of Children's Servs. v. C.L.*, No 2001-02729-COA-R3-JV, 2003 WL 22037399, at *18 (Tenn. Ct. App., filed Aug. 29, 2003).

The effort to reunite parents with their children "is a two-way street, and neither law nor policy requires [DCS] to accomplish reunification on its own without the assistance of the parents." *In re Nicholas G.*, No. 2014-00309-COA-R3-PT, 2014 WL 3778813, at \*9 (Tenn. Ct. App., filed July 31, 2014) (citing *In re Tiffany B.*, 228 S.W.3d 148, 159 (Tenn. Ct. App. 2007)). "Parents share responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* "Once services have been made available, parents must make reasonable efforts to rehabilitate themselves." *Id.* "The reasonableness of DCS's efforts should be decided on a case-by-case-basis in light of the unique facts of the case." *Id.*

It is undisputed that the terms of the permanency plans were reasonable and related to remedying mother and father's substance abuse issues. Therefore, we will focus on whether the parents' "noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656. As previously discussed, each permanency plan required mother and father to: comply with recommendations regarding legal issues; maintain stable housing, income, and transportation; notify DCS of any changes in circumstances; submit to and pass random drug screens; complete A&D assessments and follow recommendations, and sign releases for DCS. The trial court determined that both parents "initially got off to a good start." However, the court found that both parents have substantially failed to comply with the requirements of the permanency plans. The court cited mother and father's drug relapse, criminal behavior, and dishonesty with DCS.

Mother argues that outcome achievement is not the proper measure of compliance regarding a permanency plan and that a "cookie cutter" approach in crafting the plan was inappropriate in light of mother's particular circumstances. *See In re B.D., R.M.T., V.F.T.*, No. 2008-01174-COA-R3-PT, 2009 WL 528922, at \*9 (Tenn. Ct. App., filed Mar. 2, 2009). Mother also notes that the statute requires substantial noncompliance with a permanency plan's statement of responsibilities rather than its desired outcomes. *See id.* (citing *Dept. Children's Servs. v. P.M.T. et al.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at \*8 (Tenn. Ct. App. 2006)); *see also In re J.H.S.*, No. E2006-02433-COA-R3-PT, 2007 WL 1341771, at \*8 (Tenn. Ct. App., filed May 8, 2007).

We are not persuaded by mother's arguments. As previously discussed, mother missed multiple drug screens. She continued to engage in criminal conduct that resulted in multiple incarcerations. During one communication with DCS, mother admitted that she did not have transportation. Mother did not notify DCS when she moved. When DCS realized mother's housing circumstances had changed, mother was evasive. She would not provide DCS information regarding her housing situation. Later, DCS found mother living at a drug den.

We acknowledge mother's early efforts to seek rehabilitation. Mother also passed some drug tests. However, the trial court properly found that mother was substantially noncompliant. Most concerning is the degree to which mother failed to comply with the requirements aimed at remedying her substance abuse issues, the most important requirements of the permanency plan. Like the trial court, we conclude that clear and convincing evidence exists to terminate mother's parental rights on the ground of substantial noncompliance with the permanency plan.

Father, like mother, emphasizes his early acts of compliance with the permanency plan. However, father relapsed in January 2018. He began using drugs and stole his grandparents' credit card, for which he was later incarcerated. He stopped visiting the children and failed to notify DCS when he changed residences. Most importantly, father was found living at home with rampant drug abuse just days after completing a rehabilitation program at CCS.

Father also argues that the trial court failed to consider the progress he has made in recent months. *See In re Valentine*, 79 S.W.3d at 549 ("Improvement toward compliance should be considered in a parent's favor."). At the time of the termination hearing, father was not incarcerated. He testified that he was living with his father in Pennsylvania; that he had a job making seventeen dollars per hour; that he had a valid driver's license; and that he was attending an intensive outpatient treatment program.

The trial court did not discuss this testimony when the court analyzed the ground of substantial noncompliance with the permanency plan. However, in the court's analysis of a different ground, the court stated that father's testimony regarding his improved living situation "cannot be confirmed." We interpret this finding as an implicit determination that father's testimony was not credible. *See In re Wyatt S.*, No. E2012–00539–COA–R3–JV, 2012 WL 5482215, at *9 (Tenn. Ct. App., filed Nov. 13, 2012) (implicit credibility determination); *Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV2008 WL 2971767, at *4 (Tenn. Ct. App., filed Aug. 5, 2008) (implicit credibility determination). The termination order specifically states that the court "consider[ed] the credibility of the witnesses" in making its findings. The order also states that mother and father repeatedly lied about their drug abuse. We will not disturb the court's implicit finding that father's testimony was not credible. We conclude that clear and convincing evidence exists to terminate father's parental rights on the ground of substantial noncompliance with the permanency plan.

## B.

A parent's rights may be terminated on the ground that

> [a] parent or guardian has failed to manifest, by act or
> omission, an ability and willingness to personally assume

legal and physical custody or financial responsibility of the
child, and placing the child in the person's legal and physical
custody would pose a risk of substantial harm to the physical
or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

In order to prove this ground, DCS must "prove two elements by clear and
convincing evidence." *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL
3058280, at *11 (Tenn. Ct. App., filed June 20, 2018) (quoting *In re Maya R.*, No.
E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7-8 (Tenn. Ct. App., filed Apr. 4,
2018)). "First, DCS must prove that [the parent] failed to manifest 'an ability and
willingness to personally assume legal and physical custody or financial responsibility of
the child[ren].' " *Id.* Second, "DCS must then prove that placing the children in [the
parent's] legal and physical custody would pose a risk of substantial harm to the physical
or psychological welfare of the chlild[ren]." *Id.*

Circumstances that pose a risk of substantial harm to a child

are not amenable to precise definition because of the
variability of human conduct. However, the use of the
modifier 'substantial' indicates two things. First, it connotes
a real hazard or danger that is not minor, trivial, or
insignificant. Second, it indicates that the harm must be more
than a theoretical possibility. While the harm need to be
inevitable, it must be sufficiently probable to prompt a
reasonable person to believe that the harm will occur more
likely than not.

*Id.* "This [c]ourt recently determined that placing a child with a parent who had
knowingly engaged in 'repeated criminal conduct that necessitated [the parent's]
incarceration' would place the child at risk of physical or psychological harm." *Id.*
(citing *In re Ke'Andre C.*, No. M2017-01361-COA-R3-PT, 2018 WL 587966, at *11
(Tenn. Ct. App., filed Jan. 29, 2018)).

Here, the trial court found clear and convincing evidence to terminate mother and
father's parental rights on this ground. The court cited the parents' substance abuse
issues, criminal behavior, dishonesty, and failure to visit the children, "particularly after
being released from the treatment program." The court observed that both parents were
living together and had access to a cell phone. According to the court, neither parent had
a legitimate excuse for evading DCS, avoiding drug screens, and failing to visit the
children. The court expressed doubt that father had actually obtained adequate housing

- 10 -

because his testimony "cannot be confirmed." The court also noted that father had relapsed in the past, despite having a good job.

We agree with the trial court that there is clear and convincing evidence to terminate both parents' rights on this ground. The parents' history of drug abuse, criminal conduct, and dishonesty with DCS demonstrates that they lack both the ability and willingness to properly parent the children. Returning the children to either of the parents would pose a substantial risk of harm. This risk is not merely theoretical when both parents have consistently failed to maintain sobriety and follow treatment recommendations. The parents' testimony to the contrary, including father's testimony about his new living situation, must be rejected given the trial court's unfavorable credibility determinations.

## C.

The trial court also determined that mother's parental rights could be terminated on the ground of abandonment for failure to provide a suitable home. *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(ii), -113(g)(1). By statute, a parent can abandon a child when:

> (a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
>
> (b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the

department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

First, we consider whether "[t]he child[ren] [were] removed from the home or the physical or legal custody of [mother.]" *Id.* at § 36-1-102(1)(A)(ii)(a). Mother argues that the children were not removed from her physical custody because DCS took the children to father and then removed the children from *his* physical custody. However, a recent statutory amendment makes clear that children only need to be removed from a parent's "physical *or legal* custody" for this ground to be triggered. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a) (effective July 1, 2018) (emphasis added). Because the termination petition was filed on July 2, 2018, one day after the effective date of the amendment, the new statutory language applies to this case.

Second, we consider whether "[t]he juvenile court found that . . . [DCS] made reasonable efforts to prevent removal of the child[ren] or that the circumstances of the child[ren]'s situation prevented reasonable efforts from being made prior to the child[ren]'s removal." Tenn. Code Ann. § 36-1-102(1)(A)(ii)(b). In the trial court's June 14, 2017 protective custody order, the court found that DCS did make reasonable efforts to prevent removal of the children. The court cited the fact that DCS worked with mother earlier in the year to resolve substance abuse issues. DCS also attempted to place the children in father's physical custody (until DCS discovered that father was also abusing drugs).

Next, we consider whether DCS made reasonable efforts for a four-month period[2] to assist mother in establishing a suitable home. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). In this context, reasonable efforts are defined as "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-116(g)(1). "Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way." ***State, Dept. of Children's Servs. v. Estes***, 284 S.W.3d 790, 800-01 (Tenn. Ct. App. 2008) (citing ***In re C.M.M.***, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App., filed Mar. 9, 2004)). "DCS is required to use its

---

[2] "[T]he Code does not limit the window during which DCS may satisfy its obligation to make reasonable efforts to the four-month period directly following statutory removal." ***In re Jakob O.***, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App., filed Dec. 15, 2016) (citing ***In re J.D.L.***, No M2009-00574-COA-R3-PT, 2009 WL 4407786, at *12 n.8 (Tenn. Ct. App., filed Dec. 2, 2009)).

'superior insight and training to assist parents with the problems DCS has identified in the permanency plan, whether the parents ask for assistance or not.' " *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at \*9 (Tenn. Ct. App., filed June 10, 2014) (citing *State, Dept. of Children's Servs.*, 284 S.W.3d at 801). "DCS's efforts do not need to be 'Herculean.' " *Id.* "The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department." Tenn. Code Ann. § 36-1-102(1)(A)(ii).

The evidence preponderates in favor of the trial court's finding that DCS made reasonable efforts to help mother establish a suitable home. DCS did more than simply provide parents with a list of treatment providers. DCS provided treatment options, A&D assessments, visitation opportunities, and several drug screens. A DCS case manager testified that mother engaged in evasive tactics to avoid drug screens. On one occasion, mother claimed she could not visit with DCS to perform a drug screen because she did not have transportation. DCS offered to meet mother wherever was convenient for her, but mother did not cooperate. DCS tried to maintain communication with mother despite her evasive tactics. Mother also never notified DCS of her new address, so DCS was not able to perform a home visit. DCS crafted a permanency plan that was tailored to help mother achieve sobriety and establish a suitable home. Mother did make efforts to comply with some drug screens, visitations, and other recommendations by DCS. However, in light of all of the evidence in the record, the efforts made by DCS were reasonable because they clearly exceeded the efforts made by mother.

Finally, we consider whether mother made reciprocal reasonable efforts or demonstrated such a lack of concern for the children that it is unlikely she will be able to provide a suitable home for the children in the near future. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). Mother concedes that she lost housing during the pendency of the case as a result of her incarceration. However, mother argues that she made reasonable efforts to obtain suitable housing by taking the initiative to set up several assessments and by proactively seeking treatment during the early stages of this case. Mother also points to father's testimony that he had obtained housing at the time of the termination hearing.

"A suitable home requires more than a proper physical living location." *In re Hannah H.*, 2014 WL 2587397, at \*9 (citing *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at \*3 (Tenn. Ct. App., filed Nov. 29, 2007)). "It requires that the home be free of drugs and domestic violence." *Id.* "A suitable home requires a safe and stable environment in which a child can live [with] the presence of a care giver who can supply the care and attention a child needs." *In re James V.*, No. M2016-0175-COA-R3-PT, 2017 WL 2365010, at \*5 (Tenn. Ct. App., filed May 31, 2017) (citing *In re Jonathan F.*, No. E2014-01181-COA-R3-PT, 2015 WL 739638, at \*12 (Tenn. Ct. App., filed Feb. 20, 2015); *In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2105 WL

1384652, at \*9 (Tenn. Ct. App., filed Mar. 23, 2015)). Mother has achieved none of these things. Although mother claims that father has found suitable housing for the family, the trial court implicitly deemed father's testimony incredible. We therefore afford no weight to that testimony.

For the foregoing reasons, there is clear and convincing evidence to terminate mother's parental rights on the ground of abandonment for failure to provide a suitable home.

**D.**

The trial court also terminated mother's rights on the ground of abandonment by an incarcerated parent. Tenn. Code Ann. §§ 36-1-102(1)(A)(iv), -113(g)(1). This ground is triggered when

> the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of [an action or proceeding to declare a child to be an abandoned child], and . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Tenn. Code Ann. § 36-1-102(1)(A)(iv).

Mother contends that it is unclear from the record whether she was incarcerated during all or part of the four-month period immediately preceding the filing of the termination petition. The evidence in the record preponderates in favor of the trial court's finding that mother *was* incarcerated during those four months. The termination petition was filed on July 2, 2018. Therefore, the relevant four-month period is March 2, 2018 through July 1, 2018. Exhibit 12 shows that on February 19, 2018, an arrest warrant was issued for mother. Mother was served with the warrant and arrested the next day. This aligns with the testimony of a DCS worker who stated that mother was incarcerated in late February 2018. Exhibit 12 also shows that on March 12, 2018, mother pled guilty to violating the terms of her probation. Mother testified that she was incarcerated for forty-four days as a result of this guilty plea. Thus, mother's incarceration clearly occurred during the four-month period immediately preceding the filing of the termination petition.

The trial court also found that mother's criminal behavior (three DUIs, driving on a revoked license, theft, possession of drug paraphernalia, drug use, etc.) constituted wanton disregard for the welfare of the children. Mother argues that because her criminal convictions were all associated with her drug addiction, they were not the result of a "'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." ***In re Anthony R.***, No.

- 14 -

M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App., filed Jun. 9, 2015).

This Court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005) (citations omitted). In addition, "parental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration." *State, Dept. of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009). Given these precedents, mother's argument is not persuasive. The trial court correctly determined that clear and convincing evidence exists to terminate mother's parental rights on the ground of abandonment by an incarcerated parent.

**V.**

We now focus on whether termination of mother and father's parental rights is in the best interest of C.M. and M.M. Tenn. Code Ann. § 36-1-113(i) provides a list of factors to consider when making this determination:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts made by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect towards the child, or another child or adult in the family household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child to prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in the child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *State Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *In re Marr*, 194 S.E.3d 490, 499 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 1878, 194 (Tenn. Ct. App. 2004)).

The trial court expressly considered all nine statutory best interest factors. The court concluded that all factors weighed in favor of termination, except for factors (6) and (9), which the court did not deem particularly relevant to the facts of this case.

With respect to factors (1) and (2), which are closely related, mother and father argue that they have made a lasting adjustment in circumstance despite DCS's alleged lack of assistance. Both parents claimed to be sober at the time of the termination hearing. Father claimed that he was living with the paternal grandfather; that he had a

- 16 -

valid driver's license; and that he had a good job. Mother testified that she planned to move in with the paternal grandfather after being released from jail. For reasons already stated in this opinion, the evidence preponderates in favor of the trial court's finding that the parents failed to make a lasting adjustment in circumstance. Mother may have been sober at the time of the termination hearing, but she was incarcerated. The court noted that father had only been out of jail for "a very short time." We have also explained that the court implicitly rejected the truthfulness of father's testimony regarding his new living situation. Therefore, neither parent can rely on that testimony to show that they have made a lasting adjustment of circumstances. We have also explained at length how DCS made reasonable efforts to help the parents maintain sobriety and stay out of jail.

With respect to factor (3), both parents note that they regularly visited the children during the early stages of this case. Those visits generally went well. The foster mother testified that the children were emotional after the first couple of visits; however, after a few months of visitation, those emotional reactions subsided. Both parents stopped visiting the children when they relapsed. Mother was unable to visit the children for vast amounts of time during her repeated incarcerations. A DCS worker testified that the parents last visited the children in April 2018. As a result of this lack of visitation, the court found that the children no longer have a meaningful relationship with the parents. Thus, factors (3) and (4) weigh in favor of termination.

As to factor (5), the parents argue that the children would not be harmed by a change in caretakers because they have proven that they know how to care for C.M.'s special needs. They also note that the foster mother has no special training in this regard. The parents' arguments are not persuasive. At one time, mother may have been able to care for the children, including C.M.'s special needs. It is difficult to imagine, however, that mother could provide that same quality of care when she finds herself in and out of jail because of ongoing substance abuse issues. Likewise, father had only been out of jail for a short period at the time of the termination hearing. The court disbelieved his testimony regarding his improved conditions. In contrast, all of the evidence shows that the foster mother is effectively caring for the children and that she has formed a close bond with them. This factor clearly weighs in favor of termination.

Factor (6) is not relevant to this case. Factors (7) and (8) weigh heavily in favor of termination. Mother continues to struggle with drug addiction (except when she is incarcerated). She admits that emotional stress fuels that addiction. Mother claims that she has learned how to cope with this stress and will continue to address her mental health issues, but history is not on her side. Father also has a history of substance abuse issues; these issues persisted even after father completed in-patient rehabilitation. At the time of the termination hearing, there was no credible evidence that father had remedied those issues.

Factor (9) concerns child support. As the trial court intimated, DCS did not present evidence that parents paid (or failed to pay) child support. Therefore, we are unable to weigh this factor in our best interest analysis.

Although the factors discussed above are not an exhaustive list of the factors that may be considered in a best interest analysis, we have not identified any other facts that would indicate that preservation of the parent-child relationship is in the children's best interest. We agree with the trial court that the evidence clearly and convincingly demonstrates that termination of mother and father's parental rights is in the best interest of the children.

## VI.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants, M.O. and K.M. The case is remanded for enforcement of the trial court's judgment and for the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE